**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **NEODECK HOLDINGS, LLC;**<br>**ROBERTO TORRES;**<br>**RICARDO PINEDA,**<br>**Plaintiffs,**<br><br>V.<br><br>**TRIPLE-S MANAGEMENT CORPORATION;**<br>**GUIDEWELL MUTUAL HOLDING CORPORATION;**<br>**PIETRANTONI MENDEZ & ALVAREZ LLP;**<br>**THURMAN JUSTICE; JOSE NOVOA**<br>Defendants. | Civil No. ____________<br><br>COMPLAINT FOR SECURITIES FRAUD, RETALIATION, AND RELATED RELIEF<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

**TO THE HONORABLE COURT:**

**COMES NOW**, Plaintiffs NeoDeck Holdings, LLC, Roberto Torres and Ricardo Pineda, through the undersigned legal representation, and very respectfully submit their Complaint, in which the State and Pray as follows:

## NATURE OF THE ACTION

This case revolves around a fraud committed not only against the Plaintiffs but also against the United States of America, which could constitute criminal offenses. In 2010 NeoDeck Software LLC (previously Corp) partnered with Triple-S Management Corporation to form **NeoDeck Holdings**, a Puerto-Rican medical software company. NeoDeck Software held a majority stake of 51.5 % of NeoDeck Holdings, while Triple-S, then a publicly traded insurance company, received 48.5 % in exchange for capital and board participation. To protect owners' interests, the shareholders' agreement, prepared by

Pietrantoni Mendez & Alvarez LLP ("PMA Law Firm" or "PMA"), included a **Right of First Refusal (ROFR)** requiring Triple-S to give notice and offer NeoDeck the chance to purchase any shares before they could be transferred. Courts recognize that a ROFR is not a hollow formality: failure to provide the required notice renders a sale "null and void" even if the holder has no immediate ability or desire to exercise it. NeoDeck Software and Triple S reaffirmed this right at a 2016 shareholders' meeting.

More than a decade later, greed trumped fidelity. In 2021 Triple-S negotiated a lucrative merger with Florida-based GuideWell Mutual Holding Corporation. To secure an almost 49 % premium on their stock, Triple-S executives hid the fact that they held nearly half of NeoDeck Holdings' shares. In their **DEF 14A Proxy Statement** filed with the Securities and Exchange Commission ("SEC"), Triple-S falsely and fraudulently represented that, aside from its subsidiaries, it held no equity in other companies. Yet and simultaneously Triple-S' own financial statements filed in Puerto Rico, disclosed NeoDeck as an investment. By omitting this material fact, Triple-S ensured that the ROFR would not be triggered and the merger could close quickly before unfavorable financial statements surfaced, allowing its officers and directors to pocket millions of dollars. The law is clear that companies cannot mislead investors by omitting material information and then claim that the omission was immaterial; the SEC's whistleblower program specifically encourages disclosure of "false or misleading statements about a company" and prohibits retaliation or attempts to impede reporting. Rule 21F-17 makes it unlawful for any person to take action to prevent someone from contacting the SEC.

When NeoDeck's CEO and Chairman **Roberto Torres** and vice-president **Ricardo Pineda** – both whistleblowers – uncovered the fraud in 2023, they confronted

Triple-S' representatives. Rather than honor the ROFR and disclose the truth, Triple-S, its law firm **Pietrantoni Méndez & Alvarez** and newly installed CEO **Thurman Justice** engaged in preemptive retaliatory actions designed to discourage the Plaintiffs to file whistleblower complaints with the SEC and expose their fraud. A NeoDeck Holdings' board member, who was a Triple S Vice President, dared to confirm the misrepresentation and fraud, resulting in his immediate employment termination; NeoDeck's lucrative contracts with Triple S were abruptly canceled; and Triple-S' agents demanded the evidence collected by Torres and Pineda and threatened litigation unleashing GuideWell's power and political to influence the Puerto Rico Legislature and Governor if they refused. Mr. Thurman Justice leveraged his political influence with the Puerto Rico Governor to secure a position on InvestPR's Board of Directors, where he is likely to repeat similar schemes described in this Complaint. Federal law forbids precisely this kind of conduct. The SEC has repeatedly warned that companies "may not include provisions that prevent individuals from contacting the SEC with evidence of wrongdoing", and the Dodd-Frank Act's whistleblower provisions prohibit retaliation against those who report securities violations, both preemptive and after the fact.

Torres and Pineda nonetheless and courageously fulfilled their obligations. They notified Triple-S and GuideWell of their breach and, when ignored, filed a whistleblower complaint with the SEC. In response, Triple-S and its co-conspirators launched state-court lawsuits to oust them from NeoDeck's management and to regain the very shares they had secretly disavowed. Their objective is clear: silence the whistleblowers, destroy the evidence, and shield their fraud from public scrutiny. The ferocity of Defendants' retaliation is also driven by self-preservation. Triple-S and its leadership know that if the

U.S. Department of Justice or the Centers for Medicare & Medicaid Services investigate and prosecute their fraudulent federal filings, the company could be excluded from federal health-care programs and lose access to Medicare Advantage and Puerto Rico's VITAL program; violations of federal fraud and abuse laws carry criminal penalties, civil fines and exclusion from participation in federal health-care programs. Such a ban would jeopardize Triple-S's very existence and expose its management to significant monetary penalties and even imprisonment. Plaintiffs bring this action to vindicate their rights and to ensure that corporate insiders cannot enrich themselves through deception and then punish those who expose it. The law entitles them to declaratory and injunctive relief, compensatory and punitive damages, and all other remedies necessary to undo the Defendants' fraudulent scheme and retaliatory campaign.

## JURISDICTION AND VENUE

1. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question), 15 U.S.C. § 78aa (Exchange Act), and supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367.
2. Venue is proper under 28 U.S.C. § 1391 and 15 U.S.C. § 78aa because the acts and omissions occurred, in substantial part, in Puerto Rico, and several parties reside and do business in this district.

## PARTIES

3. Plaintiff NeoDeck Holdings, LLC is a Puerto Rico limited liability company organized under the laws of Puerto Rico with its principal place of business in Ponce, Puerto Rico.

4. Plaintiff Roberto Torres is a resident of Puerto Rico, Chairman and CEO of NeoDeck Holdings, and a whistleblower under the Dodd-Frank Act.
5. Plaintiff Ricardo Pineda is a resident of Puerto Rico, Vice President of NeoDeck Holdings, and a whistleblower under the Dodd-Frank Act.
6. Defendant Triple-S Management Corporation ("Triple-S") was a Puerto Rico-based publicly traded company during the events in question and is now a wholly owned subsidiary of GuideWell.
7. Defendant GuideWell Mutual Holding Corporation ("GuideWell") is a Florida-based holding company and parent of Triple-S.
8. Defendant Pietrantoni Mendez & Alvarez LLP ("PMA Law Firm" or "PMA") is a law firm located in San Juan, Puerto Rico, acting as counsel, agent and co-conspirator in the fraudulent conduct described below.
9. Defendant Thurman Justice is the CEO of Triple-S and former CFO of GuideWell. He resides in Puerto Rico and is sued in his personal capacity.
10. Defendant Jose Novoa, was the Chief Medical Officer of Triple S and former member of NeoDeck Holdings Board of Directors. He resides in Puerto Rico and is sued in his personal capacity.

**STATEMENT OF FACTS**

11. In 2010, NeoDeck Software LLC entered into what appeared to be a strategic partnership with Triple-S to form NeoDeck Holdings. NeoDeck contributed its entire operation and know-how in the Electronic Health Record business and retained a 51.5 % majority stake, while Triple-S—a giant insurer—took a 48.5 % minority position under a shareholders' agreement that promised mutual respect

and cooperation. Triple-S gained authority to impinge on NeoDeck Holdings and add clauses that could manipulate it in specific situations.

12. Triple-S was then a publicly traded company listed on the NYSE under ticker "GTS." As such it was bound by federal securities laws and subject to the SEC's oversight, yet it would soon flout those obligations with calculated indifference.

13. NeoDeck had been operating an electronic health-record business since 2002. Co-founder Ricardo Pineda, a visionary technologist, became CIO and vice-president—and later CTO—of NeoDeck Holdings, dedicating his expertise to the venture even as Triple-S plotted against it.

14. From day one the company languished under mismanagement by a board controlled by Triple-S. Triple-S' representatives assigned to the Board of Directors of NeoDeck Holdings treated the company like a toy, running up millions in losses and pushing NeoDeck Holdings to the brink of insolvency.

15. In 2016 NeoDeck Holdings majority shareholders and the Board of Directors finally turned to Roberto Torres—a CPA, CGMA and attorney—to rescue the sinking ship. Appointed chairman in 2016 and CEO in 2017, Torres slashed losses, created new products and restored NeoDeck Holdings to profitability. He protected employees and customers while Triple-S' directors jealously watched their leverage diminish. Today NeoDeck Holdings is, if not the most important, one of the top technology companies in healthcare in Puerto Rico.

16. Under Torres' stewardship NeoDeck Holdings flourished. The board and shareholders (including Triple-S' own executives) praised his leadership, and even Triple-S' former CEO publicly commended his achievements, including first time

ever dividends distribution. Yet this success only made Triple-S' insiders more determined to strip NeoDeck Holdings of its value. A few months after Torres appointment as CEO, Triple S cancelled a contract equivalent to one third of the gross revenues of NeoDeck Holdings. All after a complaint for insider corruption was flagged and brought to Triple S attention by Torres. If not for Torres strategic thinking NeoDeck Holdings would have collapsed after such unscrupulous act by Triple S.

17. In August 2021 Triple-S announced to the market what was until that moment a secret merger agreement: GuideWell Mutual Holding Corporation would acquire 100 % of Triple-S by purchasing all outstanding shares on Wall Street Stock Exchange.
18. GuideWell's takeover meant it would swallow up every Triple-S assets—including its nearly 49 % stake in NeoDeck Holdings—without ever consulting NeoDeck.
19. The transaction extinguished Triple-S as a public company and turned it into a wholly owned GuideWell subsidiary, retiring its stock and insulating its executives from shareholder scrutiny.
20. GuideWell's offer represented a 49 % premium over the 90-day average trading price. For Triple-S managers, directors and staff with stock options, the merger promised staggering, immediate wealth.
21. Every million dollars invested in Triple-S just before the announcement would yield roughly $490,000 in profit. For traders with insider knowledge, which is illegal, the gains were many times higher.

22. To maximize their windfall and avoid disclosure of ugly 2021 financials, Triple-S and GuideWell rushed the merger to completion in February 2022—weeks before the audited statements came out, which would in effect cripple their earnings.

23. On pages #111 and #112 of the Exhibit 14-A, submitted to the SEC, Triple S made false Net Income Projections for the years 2021, 2022, 2023 and 2024 to substantiate the premium of 49% over the share value. These projections varied significantly from the actual audited financial results reported to the Puerto Rico State Department and the Puerto Rico Insurer Commissioner Office websites. The projections vs. actual results are as follows:

| | 2022 | 2023 | 2024 |
|---|---|---|---|
| Net Income Projection Reported to the SEC | $ 91,000,000 | $ 137,000,000 | $ 163,000,000 |
| Actual Financial Losses* | (153,383,000) | (111,269,000) | (115,852,000) |
| Hidden Losses | $ (244,383,000) | $ (248,269,000) | $ (278,852,000) |

* See Page #54 of the accompanying financial statements for the year 2022, page #55 for the year 2023 and page #49 for the year 2024, included as **Exhibits 1, 2 and 3**.

24. These financial losses would have been reported to the SEC and to the shareholders sinking the share value and would have evaporated the 49% premium offered in the merger. It would also have catastrophic results with the Puerto Rico Insurance Commissioner if found in deficit of capital and would certainly have an impact of the Puerto Rico VITAL and Medicare Advantage qualification.

25. As explained in the following paragraphs, the Defendants had a plan to continue with the merger and they were willing to go to extreme measures to secure the gains

such merger will bring, even if it meant filing false statement to the SEC, breach fiduciary duties, legal ethical obligations and shareholders agreements provisions.

26. On pages 119 and 120 of Schedule 14-A submitted to the SEC, there is a summary detailing some of the multimillion-dollar compensation awarded to Triple S officers. Among those named is the Defendant, and NeoDeck Board Member, Dr. José Novoa, whose compensation is disclosed at over $3.1 million. Dr. Novoa demonstrated a relentless pursuit of these personal financial gains, disregarding legal boundaries and his fiduciary responsibilities in the process. This behavior was not unique to Dr. Novoa; other members of Triple S management exhibited similar disregard for their obligations, prioritizing personal enrichment over their duties to the company and its stakeholders.

27. By early 2023 Torres sensed that something was terribly wrong. Triple-S-appointed directors suddenly shunned meetings and refused to discuss the merger. Public records revealed that Triple-S' management had cashed in millions from the GuideWell deal. These same directors were among those who benefited most.

28. Throughout the merger negotiations and afterward, Triple-S executives Francisco Martorell (vice-president of corporate development) and José Novoa (chief medical officer) sat on NeoDeck's Holdings board. They had a fiduciary duty to inform NeoDeck Holdings of the impending transfer of its shares, yet they kept silent and instead pocketed millions from the merger. They evade disclosures to avoid detection of their fraud and possible criminal scheme.

29. Triple-S, its managers and PMA Law Firm all knew that NeoDeck's 2010 shareholders' agreement—and its reaffirmation at a 2016 shareholders' meeting—

contained a Right of First Refusal (ROFR). Under this clause, any direct or indirect transfer of NeoDeck shares required Triple-S to offer those shares to NeoDeck first. Courts have held that violating a ROFR can void a sale, yet the Defendants deliberately ignored it.

30. The ROF gave NeoDeck Holdings fifteen (15) days to exercise it and, if it declined, granted NeoDeck Software another fifteen (15) days. The inevitable litigation due to an improper valuation would have delayed the merger for over a year. Invocation of the ROF would have delayed the merger. Knowing the harm Triple-S's forthcoming financials would cause during that interval, Defendants, to ensure their financial gains, filed a fraudulent SEC statement and concealed their breach from NeoDeck Holdings, NeoDeck Software, and the relevant officials.

31. Triple S admitted on page #125 of Schedule 14-A filed to the SEC that any litigation, similar to one that NeoDeck Holdings would have initiated, would result in substantial costs to Triple S. Therefore, the PMA designed a way to file false statements to the SEC and fast forward the merger before those false representations were discovered. The document state the following:

> "Any litigation, if not resolved, could prevent or delay consummation of the merger and result in substantial costs to Triple-S, including any costs associated with the indemnification of directors and officers. One of the conditions to the consummation of the merger is that no applicable law or order issued by a court of competent jurisdiction or other legal restraint which is then in effect renders illegal or enjoins the consummation of the merger whether on a preliminary or permanent basis. Therefore, if a plaintiff were successful in obtaining an injunction prohibiting the consummation of the merger on the agreed-upon terms, then such injunction may prevent the merger from being consummated, or from being consummated within the expected time frame."

32. The GuideWell merger transferred, whether directly or indirectly, control over, every Triple-S asset, including NeoDeck shares, to GuideWell; thus, by definition, it triggered the ROFR as agreed by the shareholders in 2016 meeting. Triple-S treated this contractual safeguard as an inconvenience to be concealed.

33. Triple S and the other Defendants knew if the ROF were to be triggered it would delay the merger transaction and the real financial condition of Triple S would have been known to the market dissolving the false representations made in their projections and destroying the merger offered price, 49% gain over market value.

34. In summer 2023 Torres confronted Martorell about the missing NeoDeck shares. Martorell confessed that Triple-S had not disclosed the shares and had received no compensation for them, this in an effort to hide the ROF and expedite the merger. He promised to return the shares for free to NeoDeck Holdings because GuideWell never bought them. Despite Triple-S and PMA's frantic efforts to bury the evidence, Triple-S' own audited financial statements confirm that its assets—including NeoDeck shares—were transferred to GuideWell.

35. Days later, CEO Thurman Justice summarily fired Martorell for telling Torres the truth and revealing part of the fraud scheme. Mr. Justice later boasted that he had terminated Martorell to punish his candor—a stunning admission of retaliatory intent.

36. Torres launched an exhaustive internal investigation, poring over thousands of SEC filings to piece together Triple-S' deception. He would soon discover a pattern of lies and omissions designed to defraud regulators and enrich insiders.

37. Torres' investigation revealed that Triple-S's fraud did not stop in covering the existence of the ROF and NeoDeck's shares, but their greed pushed them to file SEC documents falsely claiming Triple S had no investments outside its subsidiaries—a statement designed to conceal its ownership of NeoDeck. Such omissions are exactly the type of material misrepresentation the SEC treats as securities fraud and can be prosecuted by the Department of Justice. The former FBI director faces a federal indictment for allegedly making false statements. The officers of a private corporation—and their lawyers—are equally subject to the law.

38. The critical document submitted to the SEC by Triple S was DEF 14A proxy statement for the GuideWell merger. In it, the company painted a rosy picture of the transaction and hid the existence of NeoDeck's shares to avoid triggering the ROFR and alerting regulators. Such false statement can be found on page #226 of the PDF attached to this complaint under section 3.03 (c). **See Exhibit 4.**

39. Section 3.03(c), Company Subsidiaries: Equity Interests (page 226 of accompanying pdf) of that proxy statement, brazenly asserted that, except for subsidiaries, Triple-S "does not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person." This statement was knowingly false.

40. In stark contrast, Triple-S's 2021 and 2022 annual report filed with Puerto Rico's insurance commissioner—publicly available on the regulator's website—listed NeoDeck Holdings as an investment. This contradiction is a smoking gun showing that Triple-S misled the SEC, regulators and the investing public.

41. Had Triple-S been honest about its NeoDeck shares, the ROFR would have delayed or possibly derailed the GuideWell merger. GuideWell might have withdrawn its 49 % premium offer, especially as Triple-S's soon-to-be-released financials were hiding losses in the hundreds of millions of dollars. Triple-S's directors and managers stood to lose millions, so they chose fraud over fidelity.

42. To secure their billion-dollar payday, Triple-S' leadership and co-Defendants committed fraud against the United States and the Plaintiffs, then unleashed a vicious campaign of preemptive retaliations against Torres and Pineda when they dared to expose it.

43. Throughout the merger, the law firm Pietrantoni Méndez & Alvarez (PMA) acted not as counsel but as architect of the scheme. PMA drafted the NeoDeck shareholders' agreement in 2010 and knew about the ROFR; it also reviewed the proxy statement containing the false disclosure. PMA's involvement places it as one of the criminal mastermind organizations at the center of a conspiracy that borders on organized crime.

44. Torres' investigation also suggested that Triple-S manipulated its financial statements to inflate its share price and secure federal healthcare funds with a potential tactic in depriving Puerto Rico doctors and patients of resources denying claims and services to hide their serious cash flow problems and provision reserves. If true, the company's actions could lead to criminal fines, exclusion from federal programs and other penalties.

45. In July and August 2023, NeoDeck formally notified Triple-S and GuideWell of their fraud and breach of contract. Exercising the ROFR, NeoDeck expelled

Triple-S as a shareholder and demanded that the Defendants honor the shareholders' agreements.

46. On September 26, 2023, Thurman Justice personally traveled to NeoDeck's office in Ponce. He demanded a private, unrecorded meeting without lawyers. He acknowledged NeoDeck's expulsion decision and asked for a follow-up meeting at Triple-S headquarters, casting GuideWell as an unwitting victim of Triple-S' past leadership.

47. On January 29, 2024, at Triple-S' headquarters Justice assembled a coterie of executives to impress Torres and Pineda. He offered NeoDeck millions of dollars in contracts with no strings attached—until he pulled them aside and demanded the evidence they had gathered against him and his wife. Only in exchange for destroying that evidence would he deliver the promised contracts. Torres and Pineda refused, sensing the depth of the misconduct.

48. Their refusal triggered a new investigation that uncovered potential insider trading. Justice's wife, Jahn Marie-Surette, was advising on mergers and acquisitions during the deal, raising the possibility that Justice leaked the merger to her before it was public. If true, she and her clients may have made fortunes on inside information.




49. After Torres and Pineda rebuffed his demands, Justice withdrew his contract offers in writing. A similar retraction came from Triple-S subsidiary Carepoint, confirming the punitive nature of the scheme.

50. Torres emailed Mr. Justice and Triple-S urging them to amend their SEC filings, stop their preemptive retaliatory actions and honor NeoDeck's shareholders' agreement. He warned, again, that failing to do so would force Torres and Pineda to report the fraud to the SEC and seek legal remedies.

51. Instead of coming clean, Mr. Justice escalated his retaliation in cooperation with the other Defendants. He took steps to isolate Torres and Pineda, spread false allegations and weaponized Triple-S' resources to punish them.

52. On December 2023, in preemptive retaliation and intimidating tactics Triple S fraudulently increased Mr. Torres health insurance monthly premiums under false allegations that he was a smoker. Triple S had recently tested Mr. Torres for his key man insurance and one of the tests was nicotine which produced a negative result. Despite the having evidence to the contrary, Triple S executed a preemptive retaliatory action against Mr. Torres as part of their efforts to intimidate and avoid the disclosure of their fraud to the SEC.

53. This action is similar to other strategies employed by Triple S to deny coverage to patients, deny payments to claims filed by doctors and Hospitals in Puerto Rico that has the island healthcare system on the border of collapse. Triple S' internal statistics will show multimillion dollar gains in claims and treatments rejections with the unique intent of enriching itself at immense human cost. In Torres' case, it was fraudulently implemented and with the full intent of intimidating him into stopping his filing of the complaint under the SEC and destroying the evidence of the Defendants' illegal enterprise.

54. Triple-S, Mr. Justice, PMA and GuideWell knew that if the U.S. Department of Justice or CMS investigated their conduct, the company could be barred from receiving federal funds—effectively shutting down its Medicare Advantage and Puerto Rico VITAL business—and that the individuals involved could face hefty fines and even prison. This existential threat drove their ferocious retaliation.

55. As part of that preemptive retaliation, Justice terminated NeoDeck's lucrative contract with **SALUS**, Triple-S' multiservice clinical system, inflicting millions of dollars in damages and handing the business to a competitor.

56. When intimidation and financial coercion failed, Triple-S, PMA, Mr. Jose Novoa and Mr. Justice started new preemptive retaliatory actions by filing a barrage of civil lawsuits against Torres and Pineda. These suits were designed not to vindicate rights but to silence whistleblowers and prevent further disclosures to the SEC and other federal regulators—conduct that the SEC has condemned as anti-whistleblower.

57. Mr. Jose Novoa violated his fiduciary duty as a Board Member of NeoDeck Holdings and sided with his employer, Triple S, in preemptive retaliatory acts to prevent the disclosure to the SEC and protect his ill earned millions in the merger agreement.

58. Emboldened by their wealth and believing Mr. Carlos Rodriguez, Triple S Chief Legal Counsel political influence in Puerto Rico made them untouchable, on April 10, 2024 Triple-S and PMA sued in Puerto Rico courts to reinstate themselves as NeoDeck shareholders—even though they had disclaimed ownership in SEC filings—and despite their blatant breach of the shareholders' agreement.

59. They also asked the Puerto Rico court to expel Torres and Pineda from their management positions and seize control of NeoDeck, hoping to destroy the evidence of their misdeeds, obstruct the possibility of a criminal investigation and bury the company they had spent years sabotaging.

60. Torres and Pineda made repeated pleas to Triple-S, Justice, PMA and GuideWell to stop their retaliatory campaign and allow the whistleblowers to report their findings. Those pleas were ignored.

61. With no other option, on June 30, 2025, Torres and Pineda filed a whistleblower complaint with the SEC and invoked the Dodd-Frank Act's anti-retaliation protections. They sought relief to stop the Defendants' unlawful conduct and to protect themselves from further reprisals.

62. On July 2025 NeoDeck sent cease-and-desist letters to Triple-S, PMA and GuideWell, demanding an immediate halt to the retaliation and securities violations. The Defendants responded by denying any wrongdoing and refusing to conduct any internal investigation. Guidewell was aware of what transpired with the SEC filing and refuse to amend them to avoid the financial and criminal consequences of their actions.

63. The entire scheme—from the undisclosed merger and fraudulent SEC filings to the intimidation, bribery attempts and retaliatory litigation—was illegal and designed to extract an undue advantage from the GuideWell sale while trampling NeoDeck's contractual rights. The Plaintiffs are therefore entitled to relief.

## CLAIMS FOR RELIEF

### Count I – Violation of Section 10(b) and Rule 10b-5 (Against Triple-S, PMA and GuideWell) and related sections of the Securities and Exchange Commission Act

64. Plaintiffs incorporate by reference each and every allegation contained above, as though fully set forth herein.

65. Defendants made false and misleading statements in public SEC filings with scienter, in that they had actual knowledge of the omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain the

true facts, even though such facts were available to them, when they omitted the material fact of Triple-S's ownership in NeoDeck Holdings.

66. The Defendants were affirmatively obligated to disclose the material information of NeoDeck ownership. As described herein, the Defendants made the omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon the Plaintiffs and the SEC.

67. The Defendants are therefore liable for any omission alleged herein, even if disclosure of the omitted information was not necessary to make an existing statement not misleading. Defendants are jointly and severally liable for all damages, loses and injuries caused thereby.

**Count II – Violation of the Dodd-Frank Act – Retaliation (Against all Defendants)**

68. Plaintiffs incorporate by reference each and every allegation contained above, as though fully set forth herein.

69. Plaintiffs notified in numerous occasions to Defendants of their reckless, fraudulent and illegal behavior. In response, Defendants terminated business relationships, threatened Plaintiffs, and filed meritless lawsuits to silence them, in violation of applicable law.

70. Therefore, the Defendants are jointly and severally liable to Plaintiffs for all damages caused by their illegal and retaliatory conduct.

**Count III – Conspiracy to Commit Securities Fraud (Against All Defendants)**

71. Plaintiffs incorporate by reference each and every allegation contained above, as though fully set forth herein.

72. Defendants jointly and knowingly participated in a scheme to conceal material facts and mislead investors and federal regulators. They conspired and employed schemes, devices and artifices to defraud and engage in acts, practices, dealings and course of conduct that included, among others, the omission of material facts in their disclosures and filings to the SEC. All in a scheme to obtain an undue advantage and monetary gain at the expense of the Plaintiffs.

73. Therefore, the Defendants are jointly and severally liable for all damages caused by their illegal conduct.

**Count IV – Breach of Shareholder Agreement (Against Triple-S and PMA)**

74. Plaintiffs incorporate by reference each and every allegation contained above, as though fully set forth herein.

75. Defendants violated the Right of First Refusal provision, harming NeoDeck Holdings and its stakeholders. This conduct and actions show complete and absolute bad faith and disregard, not only of the applicable laws, but of basic principles of fair and honest dealings.

76. Defendants' conduct has caused damages to the Plaintiffs, of which they are entitled to relief. Defendants are jointly and severally liable for all damages, loses and injuries caused thereby.

**Count V – Tortious Interference and Retaliation (Against All Defendants)**

77. Plaintiffs incorporate by reference each and every allegation contained above, as though fully set forth herein.

78. Defendants interfered with NeoDeck's contracts, business opportunities, and shareholder governance by retaliating against Plaintiffs' lawful disclosures.

79. Defendants' conduct has caused damages to the Plaintiffs, of which they are entitled to relief. Defendants are jointly and severally liable for all damages, loses and injuries caused thereby.

**Count VI – Supplemental Jurisdiction and request for costs, attorneys' fees and prejudgment and post judgment interest (Against All Defendants)**

80. Plaintiffs incorporate by reference each and every allegation contained above, as though fully set forth herein.

81. The facts set forth in this Complaint constitute violations to Federal as well as Puerto Rico statutes. The claims arising from said violations arise from the same nucleus of operative facts. Supplemental jurisdiction to adjudicate all claims under the Puerto Rico law is appropriate under 28 USC 1367. Defendants are liable jointly and severally to Plaintiffs for said violations.

82. The Defendants are jointly and severally liable to Plaintiffs for all sums requested in this complaint, as well as for all prejudgment and post judgment interest, cost and attorneys' fees as prescribed by Puerto Rico law.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

a) Declare that Defendants violated the Securities Exchange Act and retaliated in violation of the Dodd-Frank Act;

b) Award compensatory damages in no less than three hundred million dollars;

c) Award punitive damages where appropriate;

d) Issue injunctive relief barring further retaliation or shareholder interference;

e) Grant attorneys' fees, costs and interests;

f) Any other relief the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

**RESPECTFULLY SUBMITTED.**

In Ponce, Puerto Rico, this 29 day of October, 2025.

**/s/Pedro Santiago Rivera**
PEDRO SANTIAGO RIVERA, ESQ.
USDC-PR 216105
Counsel for Plaintiffs
Po Box 545
Yauco, PR 00698
Telephone: (787) 639-0418
E-mail:attystgo@yahoo.com